IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

|  |  |  |
|---|---|---|
| ROBERT T. COLES, et al., | ) | Case No. 4:05CV00063 |
| Plaintiffs, | ) |  |
|  | ) |  |
|  | ) | **MEMORANDUM OPINION** |
| v. | ) |  |
|  | ) | By: Jackson L. Kiser |
|  | ) | Senior United States District Judge |
| SMURFIT-STONE CONTAINER CORP., | ) |  |
| Defendant. | ) |  |

Before me now is the Defendant's Motion for Summary Judgment under Federal Rule of Civil Procedure 56. For the reasons stated herein, the Defendant's Motion for Summary Judgment will be **GRANTED**.

**I.     STATEMENT OF THE CASE**

The Defendant, Smurfit-Stone Container Corporation (hereinafter "Smurfit-Stone"), manufactures paperboard and paper-based packaging, kraft paper, corrugated containers, and point-of-purchase displays. Smurfit-Stone's Martinsville plant, the source of controversy in this case, produces corrugated containers. Before February 1, 2003, the Martinsville plant shipped its products via a fleet of drivers, maintained by the company, and independent drivers, necessary when the plant exported more shipments than the fleet drivers could handle.

The Martinsville plant's shipping load was considerable. In 2002, the plant made roughly 583 shipments each month to around 140 destinations. These shipments occurred at all hours of the

1

day and required six fleet tractors, sixty-five fleet trailers, six fleet drivers, three warehouse employees, a relief driver, and the help of nine independent hauling companies. That year, the Martinsville plant's shipping expenses totaled $1,867,442.

Smurfit-Stone chose to phase out its direct involvement in the delivery aspect of its business in order to minimize potential liability and costs. In August of 1999, Smurfit-Stone began the process of outsourcing all of the delivery work to one dedicated carrier. In 2001 and 2002, Smurfit-Stone asked for bids from national haulers to handle all of the Martinsville plant's future deliveries. Smurfit-Stone did not invite any of the independent drivers to submit a bid. Nonetheless, three of the independent drivers, none of whom are plaintiffs in this case, learned of Smurfit-Stone's plans and asked Smurfit-Stone if they could submit bids. Smurfit-Stone agreed to entertain bids from the independent drivers and ultimately accepted the bid from one of the independent drivers, Robert A. Brinegar Trucking, Inc. (hereinafter "Brinegar"), a Caucasian owned company. Effective February 1, 2003, Brinegar became the exclusive dedicated carrier for the Martinsville plant. Smurfit-Stone notified the fleet drivers and independent drivers that their services would no longer be needed after February 1.

In 2002, Brinegar had a fleet of thirteen tractors, over thirty-five van trailers, nine flatbed trailers, and a service truck. At that time, Brinegar employed thirteen drivers, three mechanics, and a full time office employee whose responsibilities included dispatching, bookkeeping, payroll, and maintaining insurance records. Brinegar hauled for a variety of companies in addition to Smurfit-Stone and realized over $200,000 in profit in 2002. Smurfit-Stone asserts that it awarded Brinegar the contract because of Brinegar's stability and growth, size, ability to make prompt repairs to its tractors and trailers, employee dedicated to dispatch and bookkeeping, familiarity with the

2

Martinsville area, previous satisfactory service, and financial strength.

The Plaintiffs, all African Americans or African American owned businesses, were substantially smaller than Brinegar. Plaintiff Robert T. Coles (hereinafter "Coles") had two trucks and one trailer. He and his brother drove the trucks. Although he owned a repair facility in Axton, Virginia, he did not employ a mechanic. Instead, he and his brother made the necessary repairs to his trucks. Coles did not employ any other employees. Ninety-five percent of his business came from Smurfit-Stone. Between 2000 and 2002, his company lost money. Although Coles claims that he once operated a trucking company that had twelve drivers and tractors, he admits that he has not done so since 1995.

Plaintiff Albert L. Carter (hereinafter "Albert Carter"), like Coles, owned two tractors. He did not own any trailers or a repair facility. He, his brother, and his son drove the tractors. He hauled exclusively for Smurfit-Stone. Additionally, like Coles, he never posted a profit in the years leading up to Smurfit-Stone's switch to a dedicated carrier.

William R. "Rick" Carter (hereinafter "Rick Carter"), also a plaintiff, owned two tractors. He did not have a repair facility and only employed another driver intermittently. In the years 2000 and 2002, Rick Carter's company posted modest profits, but never more than $15,000. Smurfit-Stone accounted for one hundred percent of his business.

Finally, Plaintiff Cleveland Green (hereinafter Green) owned one truck. He employed no other employees and owned no trailers, although he did own a small repair shop. Like Albert Carter and Rick Carter, Green hauled exclusively for Smurfit-Stone. Despite Smurfit-Stone's request, Green failed to provide records detailing the profitability of his business.

Before Smurfit-Stone switched to a dedicated carrier, each of the Plaintiffs heard rumors that

Smurfit-Stone planned to do so. Nonetheless, the Plaintiffs concede that they did not act on those rumors by asking Smurfit-Stone if they could submit bids. The Plaintiffs also assert that, at some point in the 1990's, Smurfit-Stone hired Brinegar and another Caucasian owned independent driver, Massey Trucking, to work as independent drivers. At that point, the Plaintiffs claim, Smurfit-Stone began to assign more lucrative routes to the Caucasian owned independent drivers than to the Plaintiffs.

## II.     PROCEDURAL BACKGROUND

The Plaintiffs filed this suit against Smurfit-Stone, the United States Postal Service, and the Internal Revenue Service on October 27, 2005. I dismissed the action against the United States Postal Service and the Internal Revenue Service on May 23, 2006. On September 12, 2006, Smurfit-Stone moved for Summary Judgment and filed a supporting brief. The Plaintiffs filed a response on September 29, 2006. I heard the motion on October 2, 2006, at 3:00 p.m. Consequently, the issue is now ripe for decision.

## III.    LEGAL STANDARD

Summary judgment is appropriate when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56©. A genuine issue of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247- 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir. 1987). Nevertheless, where the record taken as a whole cannot lead a rational

4

trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate; that is, the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV.  DISCUSSION

The Plaintiffs assert that Smurfit-Stone's actions in selecting a dedicated carrier denied the Plaintiffs "the right to make and enforce contracts . . . [and the right] to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" in violation of 42 U.S.C. § 1981. 42 U.S.C. § 1981 (2003), That section "can be violated only by purposeful discrimination." *Gen. Bldg. Contractors Ass'n. v. Pennsylvania*, 458 U.S. 375, 391 (1982). In § 1981 cases such as this one, in which the Plaintiffs have no direct evidence that Smurfit-Stone acted with discriminatory intent, the United States Supreme Court has applied the three part disparate treatment test, developed in Title VII cases, to determine if a defendant purposefully discriminated against a plaintiff. *Patterson v. McClean Credit Union*, 491 U.S. 164, 186 (1989). Under that test,

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

5

*Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (*quoting McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Smurfit-Stone argues that the Plaintiffs cannot make out a prima facie case of discrimination and that, even if they could, they could still not prove that Smurfit-Stone's race neutral reasons were a pretext for discrimination. I agree.

Smurfit-Stone notes that the Fourth Circuit has not yet established what elements a plaintiff must show to prove a prima facie case in a public bidding context. *DAG Petroleum Suppliers L.L.C. v. BP P.L.C.*, No. 1:05cv1323 (JCC), 2006 WL 2598390, at *2 (E.D.Va. Sept. 6, 2006). As a result, Smurfit-Stone urges this court to adopt the test used by the Eleventh Circuit. Under that standard, a plaintiff demonstrates a prima facie case for racial discrimination by proving "that the plaintiff is a member of a minority group, that he submitted an application or bid which met the requirements for an available contract, that the application or bid was ultimately rejected, and that the contract was eventually given to an individual who is not a member of a protected class." *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991). The Plaintiffs have not objected to this test, and it is comparable to the standard used by the Fourth Circuit in similar contexts. *See Williams v. Staples, Inc.*, 372 F.3d 662, 667-68 (4th Cir. 2004) (using equivalent factors to determine if the plaintiff made a prima facie case of discrimination in the context of a sale for goods or services); *Murrell v. The Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001) (applying similar factors in a case arising from the defendant's refusal to provide the plaintiff with hotel accommodations); *see also DAG Petroleum Suppliers L.L.C.*, 2006 WL 2598390, at *2 (concluding that the Eleventh Circuit's standard best comports with the Fourth Circuit's precedent in similar areas). Therefore, I will use the Eleventh Circuit's test to determine if the Plaintiffs have presented a prima facie case for discrimination.

6

Smurfit-Stone concedes that the Plaintiffs can clearly establish the first and fourth elements of the above test. The Plaintiffs are members of a protected group, and the contract was ultimately awarded to a company that was owned by an individual who is not a member of a protected group. However, Smurfit-Stone asserts that the Plaintiffs have not satisfied the second and third prongs of the test because they never bid on the contract and, even if they had, they could not have met the qualifications Smurfit-Stone sought in its dedicated carrier. Thus, Smurfit-Stone alleges, the Plaintiffs have failed to show that they submitted an application or bid that met the requirements for the contract and that their bid was ultimately rejected.

First, the Plaintiffs maintain that because Smurfit-Stone failed to notify them of the bidding process, their failure to submit a bid should be excused. Indeed, Smurfit-Stone's failure to elicit bids from them lies at the very heart of their discrimination case. Courts have not extensively discussed when a plaintiff's failure to submit a bid may be excused. Nonetheless, in *International Brotherhood of Teamsters v. United States*, the United States Supreme Court held that a member of a protected class may prove a prima facie case of discriminatory hiring even if he or she never applied for the job. 431 U.S. 324, 365–66 (1977). In that event, the plaintiff must show that the employer maintained a consistent discriminatory hiring policy that rendered application futile. *Id.* Likewise, at least one district court has concluded that the principle established in *International Brotherhood of Teamsters* applies to cases in which a company does not advertise a job opening to members of a protected class. *Rodgers v. Peninsular Steel Co.*, 542 F.Supp. 1215, 1220 (D.C. Ohio 1982). Therefore, I will assume, without deciding, that Smurfit-Stone's failure to advertise the position to the Plaintiffs excused their failure to actually apply submit a bid.

The Plaintiffs still must show that they could have submitted a bid that would have met the

7

requirements of the contract. The evidence indicates that the Plaintiffs could not have made an adequate bid for the contract. The Martinsville plant had an around the clock shipping operation that required more than ten trucks and drivers and over sixty trailers. Given the size an complexity of the operations, the contract also required a full time mechanic and dispatcher. None of the Plaintiffs owned more than two trucks, employed a full time mechanic, or employed the requisite support personnel. Therefore, none of them could have realistically expected to meet the requirements of the contract.

The Plaintiffs argue that, had they known of Smurfit-Stone's needs, they could have combined into a large enough company to accommodate the Martinsville plant. However, by their own testimony, they had only seven tractors, two workshops, eight drivers, and no support personnel. Even combined, the Plaintiffs would not have possessed the requisite equipment or personnel to handle the dedicated carrier's job. Nonetheless, they assert that they could have formed a company with at least ten tractors, ten trailers, two mechanics, a bookkeeper, and a dispatcher and that they could have assembled an even larger company, if necessary. However, the Plaintiffs have submitted no factual basis for this claim. They have not produced any business plan detailing the feasability or cost of such an expansion. They have not produced any evidence that they could have obtained the requisite financing for such a dramatic expansion of their operations. In light of the financial difficulties the Plaintiffs' individual trucking companies faced, their claim that they could have expanded to such a large operation appears fanciful.

Even if the Plaintiffs could have joined together and expanded their operations, they still could not have satisfied some important criteria Smurfit-Stone used in selecting its carrier. Smurfit-Stone maintains that, in addition to size, it also looked to the applicant's stability, financial strength,

8

and ability to buy or assume the lease on Smurfit-Stone's remaining tractors and trailers. Had the Plaintiffs formed one larger company, that company still would have lacked the stability and financial strength to meet the contract's requirements.

Although Coles had successfully managed a larger trucking operation in the past, there was no guarantee that the proposed operation would run smoothly. The company would have had to integrate several new drivers, as well as a new dispatcher and bookkeeper, into its operation. The Plaintiffs would need to find a way to coexist in a new company. Additionally, the new company would have had to service a considerable amount of debt to pay for its new trucks and employees. The company might or might not have been able to make these payments. These are typical problems to all new business, but they would have certainly combined to create an uncertain future for the new company and consequently limit its stability.

Moreover, the company would have possessed a minimal amount of financial strength. None of the Plaintiffs who provided tax records posted significant profits during the years before the switch to a dedicated carrier. Thus, the company would likely have had a small amount of working capital.

Finally, the companies financial weakness would have severely constricted its ability to absorb Smurfit-Stone's remaining fleet. While purchasing the remaining fleet might have helped the company acquire a sufficient amount of equipment to act as the dedicated carrier, it would have placed a further economic burden on the fledgling company.

In short, the Plaintiffs have produced no evidence, outside of bald assertion, that they could have acquired or possessed the capital necessary to form a company that could have bid competitively on the dedicated carrier contract. Given the meager profits many of the Plaintiffs

9

earned as independent drivers, I find it extremely unlikely that they could have formed such a large business in such a short period of time. Moreover, even if they could have produced a sufficiently sizeable business, that business could not possibly have had the requisite stability or financial strength to act as the dedicated carrier. Therefore, I find that the Plaintiffs have failed to show a genuine issue of a material fact regarding their ability to have met the requirements for the dedicated carrier contract. As a result, they cannot establish a prima facie case for discrimination.

Moreover, even if they had established a prima facie case for discrimination, the Plaintiffs would be unable to show that Smurfit-Stone's reasons for selecting Brinegar were pretextual. As stated above, Smurfit-Stone claims that it selected Brinegar because of

> (1) the stability and growth of its operation, including the fact that Brinegar did not rely solely upon Smurfit-Stone for the company's well-being; (2) the size of Brinegar, in particular the number of drivers, tractors and trailers available to the company; (3) the ability to make prompt repairs to the company's tractors and trailers, through the use of its repair facility and on-site mechanics; (4) the presence of personnel to handle dispatch and bookkeeping duties; (6) familiarity with Brinegar, and a prior history of satisfaction with the company's service to Smurfit-Stone; and (7) the company's financial strength.

The Plaintiffs point to two pieces of evidence to rebut Smurfit-Stone's claim: Smurfit-Stone's failure to inform the Plaintiffs of an opportunity to bid on the contract and Smurfit-Stone's prior practice of discriminating against African American independent drivers in assigning deliveries. None of this evidence sufficiently demonstrates that Smurfit-Stone's given reasons were a pretext.

First, the Plaintiffs argue that Smurfit-Stone demonstrated racial bias in not seeking bids from the Plaintiffs. Smurfit-Stone did not inform the independent drivers that it sought a dedicated carrier because it needed a sufficiently large and sophisticated shipping company to handle the Martinsville plant's voluminous shipments. As a result, it primarily solicited bids from large, national shipping companies. Moreover, Smurfit-Stone did not solicit bids from any of the other

independent drivers, four of whom were Caucasian. Therefore, Smurfit-Stone's failure to inform the Plaintiffs of their decision to switch to the dedicated carrier does not appear to reflect any racial discrimination.[1]

Next, the Plaintiffs maintain that because Smurfit-Stone displayed racial bias in the manner it assigned routes to independent drivers in the past, Smurfit-Stone's decision to select Brinegar as the dedicated carrier was likely based on a similar racial bias. Shipping Supervisor James Roach chose how to assign the routes, and his successor, Randy Cox, perpetuated those policies. However, a different part of the company, probably corporate transportation but certainly not Randy Cox or James Roach, decided to select Brinegar as the dedicated carrier. Therefore, the evidence of Smurfit-Stone's alleged prior discrimination is of minimal probative value.

Consequently, no reasonable juror could conclude that Smurfit-Stone did not select any of the Plaintiffs as the dedicated carrier because of racial bias. Smurfit-Stone has produced a host of legitimate, non-discriminatory reasons why it selected Brinegar as its dedicated carrier. In response the Plaintiffs have only produced two pieces of evidence that support their claims tangentially, if at all. Moreover, the Martinsville plant operated a major shipping operation. None of the Plaintiffs

---

[1] As part of this claim, the Plaintiffs assert that Smurfit-Stone did not use a certain form, developed by the corporate headquarters, to solicit bids. Therefore, the Plaintiffs contend that Smurfit-Stone may not have followed other company procedures in choosing a dedicated carrier. The issue in this case, however, is not what procedures Smurfit-Stone neglected to follow, but what procedures Smurfit-Stone did follow in selecting a dedicated carrier and whether those procedures reflect racial bias.

Additionally, the Plaintiffs maintain that Brinegar received an unfair advantage in the bidding process when Smurfit-Stone informed Brinegar what requirements it would have to meet to become the dedicated carrier. The Plaintiffs never received this information because Smurfit-Stone never invited them to place a bid and the Plaintiffs never asked to do so. As discussed above, however, Smurfit-Stone's decision not to solicit bids from the Plaintiffs does not reflect racial bias.

11

had shipping companies that could have handled all of the shipments.  In the unlikely event the Plaintiffs managed to form one company large enough to act as the dedicated carrier, that company still would have been unable to fulfill some requirements of the contract, as discussed above.  Therefore, Smurfit-Stone's choice of Brinegar over the Plaintiffs' companies appears even less suspect given the demands of the contract and the disparity of size and stability between Brinegar and the Plaintiffs.  As a result, the Plaintiffs' evidence, taken as a whole, does not demonstrate that Smurfit-Stone's reasons were pretextual, even under the liberal standard of summary judgment.  Therefore, I find that, if the Plaintiffs had established a prima facie case for racial discrimination, they still could not have rebutted Smurfit-Stone's race neutral explanations.

## V. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is **GRANTED**.

The Clerk is directed to send a certified copy of this Memorandum Opinion and the attached Order to all counsel of record.  The Clerk will be further directed to strike this case from the active docket of this Court.

ENTERED this 13th day of October, 2006.

s/Jackson L. Kiser
Senior United States District Judge

12